**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

IYANNA ANDERSON                                   *

       **Plaintiff,**                              *

v.                                                          *          **Civ. No. DLB-22-1542**

SEAT PLEASANT POLICE                           *
   DEPARTMENT, *et al.*
                                       *

      **Defendants.**

**MEMORANDUM OPINION**

Self-represented plaintiff Iyanna Anderson sues the Seat Pleasant Police Department ("the Department"), Seat Pleasant Police Officers Lee, Harmon, Blake, Bryan Stevens, and Cedric Heyward (with the Department, collectively "the Seat Pleasant defendants"),[1] the State of Maryland ("the State"), and McDonald Auto Body Works, Inc. d/b/a McDonald Towing ("McDonald Auto").  ECF 1.  Anderson alleges she was pulled over while driving her father's vehicle, that officers used excessive force against her during the traffic stop and her subsequent arrest, and that the defendants unlawfully towed the vehicle.  She asserts numerous claims, most of which are difficult to decipher.  She appears to bring claims based on the enforcement of provisions of the Maryland criminal and traffic codes that she believes violate federal and state law.  Liberally construed, her complaint also includes federal constitutional claims under 42 U.S.C. § 1983 based on false arrest, malicious prosecution, negligent training and supervision, and the use of excessive force; a claim under 42 U.S.C. § 1981; Maryland constitutional claims; and a civil conspiracy claim based on the Department's towing agreement with McDonald Auto.

---

[1] The parties do not provide the first names of Officers Lee, Harmon, or Blake.

The defendants move to dismiss in three separate motions.  ECF 6 (McDonald Auto's motion); ECF 27 (the State's motion); ECF 31 (the Seat Pleasant defendants' motion).  The Seat Pleasant defendants request summary judgment in the alternative to dismissal.  Anderson opposes the motions.  ECF 13, 30, 36, 37.  She also moves for summary judgment on all her claims.  ECF 30-2.  The State has filed a reply.  ECF 34.  No hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2023).  For the following reasons, Anderson's motion is denied, the State's motion is granted, and the Seat Pleasant defendants' motion is granted in part.  Any claims against the State are dismissed without prejudice based on the State's Eleventh Amendment immunity.  The Seat Pleasant defendants are granted summary judgment on the use of excessive force claim.  Anderson's other federal claims against the Seat Pleasant defendants are dismissed.  The only remaining claims are state-law claims, over which the Court declines to exercise supplemental jurisdiction.  The state-law claims are dismissed without prejudice.  McDonald Auto's motion, which addressed only one of the state-law claims, is denied as moot.

## I.    Background

Anderson alleges the following facts.  On May 19, 2022, she was driving her father's vehicle on Central Avenue in Seat Pleasant, Maryland when she was pulled over by Cpl. Stevens of the Seat Pleasant Police Department.  ECF 1, ¶ 10.  When Cpl. Stevens approached the vehicle, he informed Anderson she had driven across private property to avoid a traffic control device, which she denied.  *Id.* ¶ 11.  He also noted she had been using her cellphone while driving and that the vehicle's tags had expired in 2020.  *Id.* ¶¶ 11–12.  Cpl. Stevens asked for her license and registration, and Anderson handed him her "International Driving Permit," the vehicle's registration, and what she describes as her "injunction."  *Id.* ¶ 13.  The "injunction," which is attached to the complaint, is a notarized document that purports to be a "notice of motion and

2

motion to intervene with an injunction" in a nonexistent lawsuit between the Derrick Donell Bey

Express Trust d/b/a Derrick Donell Anderson (Anderson's father) and President Biden, other high-

level U.S. government officials, and several local sheriffs.  ECF 1-1.  In it, Kenneth Chloe (the

"acting trustee" and Anderson's uncle) expresses several unsound theories as to why state laws

cannot apply to the "trust" or its property.  *Id.* at 2–5.  Chloe demands the trust be put on "THE

DO NOT STOP, DO NOT DETAIN LIST."  *Id.* at 5.  He also warns the "defendants" that, pursuant

to the "contract" contained in the "injunction," there will be a "$9,000 and up charge against you

and your agencies or contractors" for interference with several vehicles on which he purports to

have a "9 Billion dollar Lien."  *Id.* at 5–6.  Finally, the "injunction" requests an answer within 72

hours of receipt.  *Id.* at 6.

Cpl. Stevens took the documents to his vehicle, and Anderson called her father on Facetime

so he and her uncle could watch the traffic stop "in case [the police] tried to do something to" her.

ECF 1, ¶ 14.  Soon, more officers arrived at the scene.  *Id.* ¶¶ 14, 16.  One of the new arrivals, Cpl.

Lee, asked Anderson to move the vehicle to a nearby convenience store parking lot, which she did.

*Id.* ¶ 15.  More time passed, and Anderson asked Cpl. Lee if there were any problems.  *Id.* ¶¶ 17–

19.  Eventually, Cpl. Stevens returned to the vehicle and ordered Anderson to step out and follow

him to his vehicle so he could explain the citations she was receiving.  *Id.* ¶ 20.  Anderson refused,

afraid that the all-male officers would kill or rape her.  *Id.* ¶ 21.  Cpl. Lee told her she did not have

a choice and that they would remove her from the vehicle if necessary.  *Id.* ¶ 22.  Anderson became

terrified and started to roll up her window.  *Id.*

Cpl. Lee reached through the window and manually unlocked the door of the vehicle.  *Id.*

¶ 23.  Two of the other officers, Harmon and Blake, entered the vehicle on the passenger side and

attempted to push Anderson out.  *Id.* ¶ 24.  Cpl. Lee threatened to tase Anderson if she did not let

go of the steering wheel, and he began to hit her hands with his fist until she let go of the wheel. *Id.* ¶ 25.  One of the officers used a knife to cut Anderson's seatbelt.  *Id.* ¶ 27.  At that point, "all [of] the officers . . . [were] hurting [her] and touching [her] body inappropriately."  *Id.*  Several officers grabbed Anderson's left leg and arm, pulled her out of the vehicle, and pinned her on the ground, which she describes as "a hot black top."  *Id.* ¶¶ 28–29.  The officers handcuffed her arms and legs as she struggled to breathe.  *Id.* ¶¶ 30–31.  Cpl. Lee stepped on her shin, "applying enormous pressure."  *Id.* ¶ 32.  The officers then picked her up off the ground and "literally threw [her] in the back seat" of a police car.  *Id.* ¶ 33.  Anderson's father and uncle witnessed the entire arrest on Facetime, and her father arrived in person at some point.  *Id.* ¶ 38.

Anderson was taken to a hospital, where she "sat chain[ed] to a wall like a prisoner."  *Id.* ¶ 34.  She complained "at least 200 times" that her handcuffs were too tight and digging into her skin, but no one loosened her handcuffs for over two hours.  *Id.* ¶ 36.  Meanwhile, her father watched McDonald Auto tow his vehicle.  *Id.* ¶ 39.  Later, Anderson was cited for driving across private property for the purpose of avoiding a traffic control device, using a cellphone while driving, displaying expired registration plates, driving without current tags, failure to display her license, driving without a license, and failure to present evidence of required security.  *Id.* ¶ 40.  She was also charged with failing to obey a lawful order from a police officer, disorderly conduct, obstructing and hindering a police officer, second-degree assault, and making a false statement to a police officer.  *Id.* ¶ 41; ECF 1-4, at 5–6.  The remainder of Anderson's complaint consists of legal conclusions about the validity of these laws and whether they can be enforced against her. ECF 1, ¶¶ 44–62.

In addition to the "injunction," Anderson attached several other exhibits to her complaint. ECF 1-2 appears to be a letter from an Arizona state senator to the director of the Arizona

Department of Public Safety, dated December 1985. The state senator noted "numerous individuals in our state have rescinded all of their contracts with the" government, "establishing themselves as freemen under the organic national Constitution," and as a result, "may be driving without auto registration, driver's licenses, or any other evidence of contract." ECF 1-2, at 3. He anticipated problems arising with law enforcement, offered to brief the director and his personnel, and requested notification about any confrontations. *Id.* ECF 1-3 comprises photos of Anderson's legs following the incident, showing minor scrapes and scratches. ECF 1-4 includes a property intake form, a towing receipt, a statement of probable cause, a statement of charges, a criminal summons and complaint, an initial appearance report, a check for $100.00 (related to the impound), a vehicle release form indicating the vehicle was released to Anderson's father (the owner), and a notice of trial date. ECF 1-7 is an "affidavit of rights" consisting of a list of quotes from various legal authorities—for example, articles of the Maryland Declaration of Rights, federal statutes, and state regulations. ECF 1-8 is an "affidavit deny [sic] consent to this administrative court," in which Anderson asserts this Court is "not a real court of law established by Article III of the Constitution" and states she does not agree to any "trial like" proceedings.

ECF 1-9 is an affidavit from Anderson's uncle ("Chloe"), and ECF 1-10 is an affidavit from Anderson's father ("Derrick"). Chloe states Derrick called him on May 19 after Anderson was pulled over. Derrick then went to the scene and called Chloe back, at which point Derrick went to the police station. Chloe heard Derrick talk to the police chief and another officer, Lee. Derrick tried to explain why they believed Maryland's laws did not apply to Anderson and could not be enforced against her, including because "she doesn't work for State Of Maryland" and "she was in her private capacity at the time for spiritual reason of worship to her god." ECF 1-9, at 2. The chief ended the conversation and agreed to provide names and badge numbers for the officers

involved in the arrest.  Chloe also refers to the "**INJUNCTION** (CONTRACT)" discussed above. *Id.* at 3–4.  Derrick covers much the same ground, adding details about his interactions with other officers.  ECF 1-10, at 1–2.  He also mentions having to pay $365.00 total to retrieve his vehicle from the impound lot.  *Id.* at 4.

Anderson provided additional evidence as exhibits to her oppositions to the defendants' motions and her own motion for summary judgment.  ECF 13-1 consists of photos of Derrick at the scene of the arrest before the vehicle was towed.  ECF 30-4 includes duplicative copies of some of the documents related to Anderson's criminal case.  And ECF 37-2 is a copy of a receipt for an auto insurance payment for the vehicle.  Anderson also attached other documents that she describes as affidavits, but they contain legal arguments and are more accurately characterized as motions, oppositions, and replies.  *See* ECF 30-1, 30-2, 30-3, 36-1, 36-2, 37-1.

The Seat Pleasant defendants provided an affidavit from Cpl. Stevens that recounts his version of events.  Generally, Cpl. Stevens' affidavit matches the statement of probable cause he provided regarding the incident.  *Compare* ECF 31-2, *with* ECF 1-4.  On May 19, 2022, Cpl. Stevens was conducting traffic enforcement when he saw Anderson use her cellphone while driving and drive across private property to avoid a traffic control device.  ECF 31-2, ¶ 5.  After pulling her over, he noted the vehicle's registration plates had expired in 2020.  *Id.* ¶ 6.  He asked for Anderson's license and registration, and she handed him a registration card and several laminated documents.  *Id.* ¶ 8.  One of the documents "purported to be driving privileges" but "was not from any state or foreign country[.]"  *Id.*  The document identified Anderson as "Iyanna Bey" and provided a date of birth.  *Id.*  When asked, Anderson confirmed her name was "Iyanna Bey." *Id.* ¶ 9.  Based his knowledge and experience, Cpl. Stevens recognized the documents as associated

with the "sovereign citizen movement" whose members "contend they are not subject to the laws of any particular State," and he requested a supervisor to respond to the scene.  *Id.* ¶ 10.

Soon, Cpl. Lee arrived with Officers Harmon and Blake, at which point Cpl. Stevens performed a wanted and driver's license check on "Iyanna Bey" using the date of birth from the international driver's document.  *Id.* ¶ 11.  The search found no driver's license on file in the District of Columbia, Maryland, or Virginia, and Cpl. Stevens determined the vehicle would have to be towed and Anderson issued several citations.  *Id.* ¶¶ 11–12.  Cpl. Stevens returned to the vehicle and asked Anderson to step out to ensure she did not attempt to drive away.  *Id.* ¶ 13.  She refused, despite being asked several times.  *Id.*  Cpl. Stevens and Cpl. Lee then opened the driver's door so they could remove Anderson.  *Id.* ¶ 14.  She braced herself to prevent removal and kicked at the officers.  *Id.*  Eventually, the officers successfully removed Anderson, brought her to the ground, and handcuffed her.  *Id.* ¶ 15.  She continued to kick at them, so they also placed a restraint on her ankles.  *Id.*  A subsequent inventory search of the vehicle yielded a District of Columbia identification card with Anderson's photograph and the name "Iyanna Jessica Anderson," from which Cpl. Stevens determined Anderson had a valid D.C. driver's license.  *Id.* ¶ 17.  Cpl. Stevens denies seeing any officer strike Anderson or use a weapon.  *Id.* ¶ 18.

The Seat Pleasant defendants also provided a video recording of the traffic stop from Cpl. Stevens' body-worn camera, which generally matches Cpl. Stevens' recollection.  ECF 31-3.  The Court focuses on the officers' use of force.  When Cpl. Stevens first asked Anderson to step out of the vehicle, she refused.  *Id.* at 12:05:11.  Cpl. Stevens told Anderson she needed to step out of the vehicle because she had not produced a valid driver's license and procedure called for her to exit the vehicle.  After Anderson continued to refuse, Cpl. Lee unlocked and opened the driver's door.  *Id.* at 12:06:04.  When Anderson attempted to shut the door, Cpl. Lee grabbed her arm to prevent

her from doing so, then released her.  *Id.* at 12:06:29.  The officers then tried to remove Anderson from the car from both the driver's side and passenger's side.  *Id.* at 12:06:45.  Anderson continued to resist with her left hand while holding her phone in her right hand.  Cpl. Stevens pulled out a knife and cut the lowest part of her seatbelt while her body was turned away from him and towards the passenger's side.  *Id.* at 12:07:13.  Anderson put her foot on the steering wheel to brace herself.  *Id.* at 12:07:20. Several officers, including Cpl. Stevens, put gloves on and began grabbing her arms and legs to remove her from the car.  *Id.* at 12:07:35.  Anderson continued to hit the officers and flail her body.  *Id.* at 12:07:40 – 12:08:22.  She put both feet up on the dashboard.  *Id.* at 12:07:50.  Eventually, officers removed Anderson from the vehicle, and she fell to the ground.  *Id.* at 12:09:00.  Officers placed handcuffs on her while she was on the ground.  *Id.* at 12:09:12. Anderson then stood up, and officers walked her towards a police cruiser.  *Id.* at 12:09:18.  As she neared the vehicle, Anderson began resisting again, including kicking at the police car and twisting her body from side to side.  *Id.* at 12:09:23. After walking Anderson away from the vehicle, an officer adjusted Anderson's handcuffs, then attempted once more to put her in the police cruiser.  *Id.* at 12:10:02. Anderson continued to resist and was placed on the ground.  *Id.* at 12:10:49.  She kicked at officers while they attempted to place her legs in a restraint device.  *Id.* at 12:11:24.  One officer placed his knee on Anderson's calf while other officers restrained her arms and legs.  Once Anderson's hands and feet were restrained, the officers successfully placed her in the cruiser.  *Id.* at 12:12:50.

Anderson filed this lawsuit on June 22, 2022.  She requests the defendants be removed "from their public office of trust" and seeks $15 million in damages.  ECF 1, ¶¶ 63–64.  The State moves to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1), all

defendants move to dismiss for failure to state a claim under Rule 12(b)(6) and, alternatively, the Seat Pleasant defendants seek summary judgment.

## II.     Standard of Review

"A motion to dismiss based on lack of subject matter jurisdiction pursuant to Rule 12(b)(1) raises the question of whether the Court has the competence or authority to hear the case." *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005).   "Federal courts are courts of limited jurisdiction[,]" possessing "only that power authorized by Constitution and statute." *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010) (quoting *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994)).   The plaintiff, as the party asserting jurisdiction, bears the burden of establishing it.   *Id.*   When defendants contest subject matter jurisdiction "by contending that, even assuming that the allegations are true, the complaint fails to set forth facts upon which jurisdiction is proper"—a facial challenge to jurisdiction—the plaintiff "is afforded the same procedural protections as [she] would receive under a Rule 12(b)(6) consideration[.]" *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)) (internal quotation marks omitted).   Dismissal for lack of subject matter jurisdiction is proper "where a claim fails to allege facts upon which the court may base jurisdiction."   *Davis*, 367 F. Supp. 2d at 799.

Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted."   *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)).   To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the Court.   *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).   A plausible claim is more than merely conceivable or speculative.   *See Holloway v. Maryland*, 32 F.4th 293,

299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). But the claim does not need to be probable, and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ is the Answer Ministries, Inc. v. Balt. Cnty., Md.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the Court must accept the allegations as true and draw all reasonable inferences in favor of the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765, 777 (4th Cir. 2022). When the allegations in the complaint conflict with an exhibit, "the exhibit prevails." *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991). The Court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 917 F.3d 206, 212 (4th Cir. 2019)). On a Rule 12(b)(6) motion, the Court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

"[P]ro se filings are 'h[e]ld to less stringent standards than formal pleadings drafted by lawyers.'" *Folkes v. Nelsen*, 34 F.4th 258, 272 (4th Cir. 2022) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). Accordingly, the Court must construe *pro se* pleadings liberally. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1376 (2021). But

"liberal construction does not require [the Court] to attempt to 'discern the unexpressed intent of the plaintiff'"; the Court need only "determine the actual meaning of the words used in the complaint." *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006) (en banc)). Thus, a *pro se* complaint "still 'must contain enough facts to state a claim for relief that is plausible on its face.'" *Thomas v. The Salvation Army S. Territory*, 841 F.3d 632, 637 (4th Cir. 2016) (quoting *King v. Rubenstein*, 825 F.3d 206, 212, 214 (4th Cir. 2016) (quoting *Twombly*, 550 U.S. at 570)).

When the parties present and the Court considers matters outside the pleadings on a Rule 12(b)(6) motion, the Court must treat the motion as one for summary judgment under Rule 56, and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). The Seat Pleasant defendants' motion requested summary judgment, discussed the pertinent standard, and provided evidence to contradict Anderson's allegations. ECF 31. Anderson, for her part, also moves for summary judgment and has submitted additional evidence in support of her motion and in opposition to the Seat Pleasant defendants' motion. ECF 30 & 36. The Court concludes Anderson received adequate notice that the Seat Pleasant defendants' motion could be treated as one for summary judgment and has had an opportunity to present evidence in opposition, and it will treat the Seat Pleasant defendants' motion as one for summary judgment as to Anderson's excessive force claim. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998).

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations . . . admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The opposing party must identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment. *Id.* at 251. The Court "should not weigh the evidence." *Perkins*, 936 F.3d at 205 (quoting *Anderson*, 477 U.S. at 249). However, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," then summary judgment is proper. *Id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). In ruling on a motion for summary judgment, the Court "view[s] the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party." *Perkins*, 936 F.3d at 205 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996)).

## III. Analysis

At the outset, the Court notes Anderson's pleading is confusing and difficult to parse. It bears some of the trappings of a traditional civil complaint, but it is muddled by run-on references to authorities, littered with legal terminology of dubious relevance, and bolded and capitalized throughout. For example, in two introductory paragraphs, Anderson states:

> This is an action and claim for damages and injunctive relief to remedy the **excessive force, police brutality, tortuous interference, harassment, discriminated against, monopolies, negligent training of the law, intentional infliction of emotional distress, false arrest and imprisonment, deprivation of civil rights of my rights breach of trust, trespass, bad faith, unclean hands, enforcement of unconstitutional laws, breach of the peace, malicious and**

**maladministration** (which is a violation of my right to life, liberty and pursuit of happiness) of Plaintiff common law (As distinguished from law created by the enactment of legislatures, Blacks Law 5th Edition) rights that resulted from the Defendant's agents, agency acting on behalf of the Defendant.

**MAXIM**:  Common knowledge includes matters of learning, experience, history, and facts which judicial notice may be taken, and may be referred to in argument of counsel.

Defendant's failed to obey (**INJUNCTION PROVIDED TO THEM AT THE TIME OF THE BREACH OF THE PEACE**) my private rights and liberties protected by Maryland 1867 Constitution Article 1, 2, 3, 4, 5, 6, 8, 16, 17, 19, 20, 21, 23, 24, 25, 26, 27, 30, 36, 41, 42, 44, 45, 46, 47, MAXIM, ARTICLE III LEGISLATIVE DEPARTMENT SEC. 33, ARTICLE I ELECTIVE FRANCHISE SEC. 9, ARTICLE III LEGISLATIVE DEPARTMENT SEC. 40. (40,A,B,C), CIVIL RIGHTS ACT OF 1866 CHAP. XXXI. Section 1-2, 1789 United States 1st Amendment and Federal Judiciary Act of 1789 defendants have in fact violated their contract (OATH OF OFFICE) and trust indenture (BILLS AND DECLARATION OF RIGHTS).  (SEE INJUNCTION EXHIBIT A)

**MAXIM**:  Agreements give the law to the contract.

ECF 1, ¶¶ 8–9.  Few of terms and authorities listed in these paragraphs connect to the factual allegations or the claims Anderson later identifies in her complaint.[2]

With that context, the Court parses Anderson's claims.  First, she asserts Maryland constitutional claims arising from the enforcement of provisions of Maryland's traffic and criminal codes against her:

1. Enforcement of Maryland traffic code (prohibition against driving across private property for the purpose of avoiding a traffic control device) by Cpl. Stevens in violation of Article I, § 9 of the Maryland Constitution.  ECF 1, ¶ 52.

---

[2] The tenor of Anderson's pleading is similar to that of the sovereign citizen movement, though Anderson denies any association with that movement.  "Adherents to the 'sovereign citizen' theory 'believe that the state and federal governments lack constitutional legitimacy and therefore have no authority to regulate their behavior.'"  *Cruel-El v. South Carolina*, No.  6:18-cv-1680-HMH-JDA, 2018 WL 3628844, at *3 (D.S.C. July 10, 2018) (quoting *United States v. Ulloa*, 511 F. App'x 105, 106 n.1 (2d Cir. 2013)).  Such arguments are baseless, as numerous courts have held, and should be rejected summarily.  *Id.* (collecting cases).

2.  Enforcement of Maryland criminal code (prohibition against false statements to police officers) by the individual officers in violation of Articles 27, 36, and 42 of the Maryland Declaration of Rights. *Id.* ¶ 54.

3.  Enforcement of Maryland criminal code (prohibitions against disorderly conduct, obstructing and hindering, and second-degree assault) by the individual officers in violation of Article 16 of the Maryland Declaration of Rights. *Id.* ¶ 55.

4.  Enforcement of Maryland traffic code (prohibition against driving without a license) by Cpl. Stevens in violation of Article 26 of the Maryland Declaration of Rights. *Id.* ¶ 56.

5.  Enforcement of Maryland criminal code (failure to obey lawful order of police officer) by Cpl. Stevens in violation of Article 24 of the Maryland Declaration of Rights. *Id.* ¶ 57.

6.  Enforcement of Maryland traffic code (failure to present evidence of required security to police upon request) by Cpl. Stevens in violation of Article III, § 33 of the Maryland Constitution. *Id.* ¶ 58.

7.  Enforcement of Maryland traffic code (prohibition against driving without current tags) by Cpl. Stevens in violation of Article 17 of the Maryland Declaration of Rights. *Id.* ¶ 59.

Second, she asserts two federal claims based on the enforcement of other provisions of the traffic code:

8.  Enforcement of Maryland traffic code (failure to display license to police upon request) by Cpl. Stevens in violation of Article IV of the Articles of Confederation. *Id.* ¶ 53.

9.  Enforcement of Maryland traffic code (prohibition against use of a cellphone while driving; prohibition against displaying expired registration plates) by Cpl. Stevens in violation of the Civil Rights Act of 1866. *Id.* ¶ 60.

Next, she asserts claims for damages based on the alleged violation of her Fourth Amendment rights during and after the traffic stop, which the Court interprets as brought pursuant to 42 U.S.C. § 1983:

10. Excessive force, asserted against the individual officers. *Id.* at 30.

11. False arrest, asserted against Cpl. Stevens. *Id.* at 31.

12. Malicious prosecution, asserted against Cpl. Stevens. *Id.* at 32.

13. Negligent training and supervision of Cpl. Stevens, presumably asserted against the Department. *Id.* at 31.

Finally, she asserts two more Maryland constitutional claims and a civil conspiracy claim:

14. Violation of Article 16 of Maryland's Declaration of Rights (cruel and unusual punishment) by Cpl. Stevens. *Id.* at 30.

15. Violation of Article 41 of Maryland's Declaration of Rights (prohibition against monopolies) by the Department and McDonald Auto. *Id.* ¶¶ 61–62.

16. Civil conspiracy between McDonald Towing and the Department to unlawfully confiscate private property. *Id.*

Anderson also refers to racketeering, extortion, violence against women, battery, trespass, perjury, falsification of documents, breach of peace, slavery, tortious interference, emotional distress, the First Amendment, and more, but she does not seem to attempt to bring claims based on these concepts.

The defendants challenge each of Anderson's claims. The Court first addresses whether it has jurisdiction to hear Anderson's claims against the State. The Court then considers Anderson's motion for summary judgment before considering the viability of her federal claims, which are the only asserted basis for the Court's subject matter jurisdiction.[3]

### A.  Claims Against the State

Anderson names the State as a defendant, though it is not clear which of her claims are against the State.[4]  What is clear is that none of Anderson's asserted claims may proceed against

---

[3] Anderson alleges she is a resident of Maryland. ECF 1, ¶ 2. On her civil cover sheet, ECF 1-6, she asserted diversity as the basis for the Court's jurisdiction, but she noted that both she and the defendants were citizens of Maryland. Thus, Anderson has not established the requirements for diversity jurisdiction. *See* 28 U.S.C. § 1332(a); *Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 352 (4th Cir. 2020) (discussing complete diversity of citizenship requirement).

[4] Anderson refers to the State in paragraph three of her complaint, but she does not allege any conduct by it or any of its agents. "Where a complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff," dismissal is appropriate. *Cofield v. Maryland*, No. CCB-16-1985, 2018 WL 4007649, at *4 (D. Md. Aug. 21, 2018).

the State.  "A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."  *Coleman v. Court of Appeals of Md.*, 566 U.S. 30, 35 (2012).

The Eleventh Amendment provides:  "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  "Although by its terms the Amendment applies only to suits against a State by citizens of another State, [the Supreme Court's] cases have extended the Amendment's applicability to suit for damages by citizens against their own States."  *Bd. of Trs. of Univ. of Ala v. Garrett*, 531 U.S. 356, 363 (2001).  Under the Eleventh Amendment, the State, its agencies, and its departments are immune from suits in federal court brought by its citizens or the citizens of another state unless the State consents to suit.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *see also Cunningham v. Lester*, 990 F.3d 361, 365 (4th Cir. 2021).

Anderson argues that the Eleventh Amendment is an invalid, *ex post facto* law.  "[T]he constitutional prohibition on *ex post facto* laws applies only to penal statutes which disadvantage the offender affected by them."  *Collins v. Youngblood*, 497 U.S. 37, 41 (1990); *see Nezirovic v. Holt*, 779 F.3d 233, 239 (4th Cir. 2015).  Neither the Constitution, nor its amendments, are *ex post facto* laws.

There are limited exceptions to Eleventh Amendment immunity, none of which applies here.  As the Fourth Circuit has summarized:

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court.

*Lee-Thomas v. Prince George's Cnty. Pub. Schs.*, 666 F.3d 244, 249 (4th Cir. 2012) (quotation marks and citations omitted).  Anderson brings a mix a state-law torts, Maryland constitutional claims, and federal civil rights claims, and she does not identify any federal law abrogating the State's immunity against such claims.  The second exception, known as the *Ex parte Young* doctrine, "allows private citizens, in proper cases, to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute."  *Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir. 2002) (referring to *Ex parte Young*, 209 U.S. 123 (1908)).  Anderson does not sue any State official, and she does not seek to enjoin the future enforcement of any of the laws she challenges.  Rather, she seeks damages and the removal of the defendants from "public office."  ECF 1, ¶¶ 63–64.  Finally, Anderson does not identify any waiver of immunity by the State applicable to her claims, and the Court is aware of none.[5]  Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-202(a), but it has not waived its Eleventh Amendment immunity to suit in federal court.  *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 397–98 (4th Cir. 1990) ("The waiver of sovereign immunity in the Maryland Torts Claims Act clearly limits the state's waiver of immunity to actions brought in the Maryland state courts.").

The State's motion to dismiss is granted.  To the extent Anderson brings claims against the State of Maryland, they are barred by the Eleventh Amendment and dismissed without prejudice.

---

[5] Anderson argues "state sovereign immunity is waved [sic] in this matter when there is a duty and obligation to protect the rights of WE THE PEOPLE."  ECF 30-1, at 3.  There is no authority supporting such a broad waiver.

### B. Anderson's Motion for Summary Judgment

Anderson moves for summary judgment "and settlement" of her claims, requesting the Court order "the trial court of this case to immediately grant to" her the $15 million in damages she seeks. ECF 30-2, at 2. She argues the defendants failed to respond to her claims and are time barred from doing so under Federal Rule of Civil Procedure 12(a)(2) or (3). She asserts their "serious offenses need to be addressed immediately with the least amount of technical nuances of the law and legal procedures because these offenses are flowing continually against [her] liberties and life and pursuits of happiness consequently [sic] is a continual national security breach and national emergency." *Id.*

Anderson's contentions are without merit. The defendants timely responded to her claims. McDonald Auto and the State did so within 21 days of service, as required by Rule 12(a)(1)(A)(i). ECF 4 & 6; ECF 23 & 27. The Seat Pleasant defendants requested an extension of their time to respond, which the Court granted, and they responded within the time the Court granted. ECF 25 & 29. Rules 12(a)(2) and (3) concern suits against the United States, its agencies, and its officers and employees; Anderson does not sue any federal entity, so those rules have no bearing on this case. Moreover, a defendant's failure to timely respond to a complaint does not automatically entitle the plaintiff to her requested relief. *See* Fed. R. Civ. P. 55(b)(2); *Agora Fin., LLC v. Samler*, 725 F. Supp. 2d 491, 494 (D. Md. 2010) (noting that although a defendant admits factual allegations by failing to respond, it is "for the court to determine whether these unchallenged factual allegations constitute a legitimate cause of action").

Anderson's motion for summary judgment is denied.

### C.  Maryland Traffic Code Challenges Based on Federal Law

Anderson claims certain Maryland traffic laws—the requirement that drivers display a license to police officers upon request, the prohibition against the use of a cellular phone while driving, and the prohibition against the display of expired registration plates—violate federal law, specifically Article IV of the Articles of Confederation and the Civil Rights Act of 1866.  Neither claim has merit.  The Articles of Confederation have no present legal force.  That agreement was replaced by the United States Constitution in 1789 and no longer is a valid source of law.  Even if the Court could enforce any provision of the Articles of Confederation, Anderson does not identify the scope of the right she asserts or explain how Maryland's traffic code impermissibly infringes on it.   Anderson's Articles of Confederation claim is not cognizable and is dismissed with prejudice.

The Civil Rights Act of 1866 was amended and codified at 42 U.S.C. §§ 1981 *et seq*. Section 1981 prohibits intentional racial discrimination, "whether or not under color of law, with respect to the rights enumerated therein."  *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 387–88 (1982) (quoting *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 435 (1968)). Section 1981(a) provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and extractions of every kind, and to no other.

While § 1981 often is used to assert employment discrimination claims against private actors, it also protects against the "racially motivated misuse of government power" by police officers. *Stout v. Reuschling*, No. TDC-14-1555, 2015 WL 1461366, at *5 (D. Md. Mar. 27, 2015) (quoting *Bell v. City of Milwaukee*, 746 F.2d 1205, 1232 (7th Cir. 1984), *overruled on other grounds by*

*Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005)).  But Anderson does not allege facts that suggest intentional racial discrimination by the any of the individual officers.  She does not allege, for example, that any of the officers used racial slurs, commented about her race, or treated any white individual differently than they treated her.  Indeed, race is not discussed at all in the complaint. Because Anderson fails to allege any facts suggesting the officers "intended to discriminate on the basis of race," her § 1981 claim is dismissed without prejudice.  *See Williams v. Wicomico Cnty. Bd. of Educ.*, 836 F. Supp. 2d 387, 394 (D. Md. 2011) (quoting *Baltimore–Clark v. Kinko's Inc.*, 270 F. Supp. 2d 695, 699 (D. Md. 2003)).[6]

### D.  Section 1983 Claims

Anderson next claims the Seat Pleasant defendants violated her Fourth Amendment rights. She refers to excessive force, false arrest, malicious prosecution, and negligent training and supervision.  Although she does not cite 42 U.S.C. § 1983 as the basis for her claims, she alleges police misconduct and seeks monetary damages, so the Court will analyze her claims within that statutory framework.

Under Section 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  Section 1983 "is not itself a source of substantive rights, but merely provides 'a method for vindicating federal rights

---

[6] The defendants argue the § 1981 claim fails because 42 U.S.C. § 1983 provides the "exclusive" remedy for violation of § 1981 by state actors.  *See Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995).  That rule requires courts to analyze § 1981 claims against state actors within the § 1983 framework; it does not warrant automatic dismissal of § 1981 claims against state actors. *See Thomas v. City of Annapolis*, 851 F. App'x 341, 347–48 (4th Cir. 2021) (unpublished); *Stout*, 2015 WL 1461366, at *7.

elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *Wahi v. Charleston Area Med. Ctr.*, 562 F.3d 599, 615 (4th Cir. 2009).  "To recover damages under 42 U.S.C. § 1983, a plaintiff must show (1) 'the conduct complained of was committed by a person acting under color of state law,' and (2) this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States."  *Martin v. Duffy*, 977 F.3d 294, 298–99 (4th Cir. 2020) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)).

### 1.  Malicious Prosecution and False Arrest

Anderson asserts Cpl. Stevens committed malicious prosecution and false arrest.  "A claim of malicious prosecution under § 1983 is a claim 'founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution.'"  *Smith v. Munday*, 848 F.3d 248, 252 (4th Cir. 2017) (quoting *Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000)).  "The Fourth Amendment claim requires 'that [1] the defendant ha[s] seized plaintiff pursuant to legal process that was not supported by probable cause and [2] that the criminal proceedings have terminated in plaintiff's favor.'"  *Id.* at 253 (quoting *Massey v. Ojaniit*, 759 F.3d 343, 356 (4th Cir. 2014)).  "A claim for false arrest alleges that a warrantless arrest lacked probable cause[.]"  *Id.* at 257 (citing *Brooks v. City of Winston–Salem*, 85 F.3d 178, 181–82 (4th Cir. 1996)); *see also Rogers v. Pendleton*, 249 F.3d 279, 294 (4th Cir. 2001) (noting false arrest and malicious prosecution claims "are essentially alleging a seizure of the person in violation of the Fourth Amendment").

"Whether probable cause exists in a particular situation . . . always turns on two factors in combination:  the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct."  *Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016) (quoting

*Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992)). In determining what conduct was known to an officer, courts consider only "information actually possessed by the officer at the critical time, or that was then reasonably available to him, and in light of any exigencies of time and circumstance that reasonably may have affected the officer's perceptions." *Id.* (quoting *Pritchett*, 973 F.2d at 312) (modification deleted).

Anderson does not allege there was no probable cause to support her arrest. She does not deny that she committed several traffic violations and refused to exit her vehicle when instructed to do so, and she admits she "tried to defend [her]self" when officers attempted to remove her by force. ECF 1, ¶¶ 10–13, 21–22, 27. Rather than contest probable cause for her arrest, Anderson argues Maryland's laws cannot be enforced against her, *see id.* ¶¶ 44–51, and any warrantless arrest for a misdemeanor violates due process, *see* ECF 36-1, at 3–10. Even if these arguments were grounded in the law, which they are not, Anderson still fails to allege an essential element of both malicious prosecution and false arrest—that her arrest was unsupported by probable cause. Her § 1983 false arrest and malicious prosecution claims are dismissed without prejudice.[7]

### 2. Excessive Force

Anderson alleges the individual officers hurt her, touched her inappropriately, threatened her with a knife, forcibly removed her from the vehicle, made her lie on hot pavement, threw her into the police car, and made her wear tight handcuffs for over two hours. The Seat Pleasant defendants counter that the officers used reasonable force in removing Anderson from the vehicle

---

[7] To the extent Anderson sought to bring state-law claims of malicious prosecution and false arrest, the analysis dovetails with the Fourth Amendment analysis. Malicious prosecution requires the institution of criminal proceedings without probable cause. *S. Mgmt. Corp. v. Taha*, 836 A.2d 627, 637 (Md. 2003). False arrest requires the deprivation of liberty without legal justification, and whether legal justification exists depends on the officer's legal authority to arrest. *See Heron v. Strader*, 761 A.2d 56, 59 (Md. 2000); *Montgomery Ward v. Wilson*, 664 A.2d 916, 926 (Md. 1995).

and placing her under arrest.  The Court has reviewed the evidence, including the body-cam footage of the traffic stop, and concludes Anderson's excessive force claim fails as a matter of law.

The Fourth Amendment "prohibits police officers from using force that is 'excessive' or not 'reasonable' in the course of making an arrest."  *Meyers v. Balt. Cnty., Md.*, 713 F.3d 723, 732 (4th Cir. 2013) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  "Whether an officer has used excessive force depends on 'the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"  *Rivas-Villegas v. Cortesluna*, --- U.S. ----, 142 S. Ct. 4, 8 (2021) (quoting *Graham*, 490 U.S. at 396).  Courts also may consider

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Lombardo v. City of St. Louis*, --- U.S. ----, 141 S. Ct. 2239, 2241 (2021) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).  "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham*, 490 U.S. at 397.  The analysis must focus on "the facts at the moment that the challenged force was employed [] with an eye toward the proportionality of the force in light of all the circumstances."  *Yates v. Terry*, 817 F.3d 877, 885 (4th Cir. 2016) (quoting *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015)).

The Seat Pleasant defendants provide the video recording of the incident from Cpl. Stevens' body-worn camera, and Anderson does not challenge the accuracy of the recording.  The recording reveals officers using force proportionately to control Anderson in response to her escalating resistance.  After Anderson refused to exit the vehicle, the officers opened the vehicle's

door.  As she continued to resist, an officer quickly used a knife to cut her seatbelt while her body was turned away, then put the knife away.  When Anderson positioned her body to avoid being removed from the vehicle and began lashing out, officers grabbed her limbs.  Anderson fell to the ground as she was pulled out of the vehicle, at which point officers handcuffed her.  She was on the ground for less than one minute.   After she stood up, an officer adjusted her handcuffs, though it is not clear whether they were loosened or tightened.  She resumed struggling and kicked at the officers and a police vehicle, at which point officers forced her onto the ground a second time.  She remained on the ground for approximately two minutes while officers held and put pressure on her limbs and placed a leg restraint on her.  She is then allowed to stand up and placed in the police car.

"[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977).  Police officers may "exert some physical force to effectuate the order," and, unless the force is excessive, they do not violate the Fourth Amendment in doing so.  *Coleman v. Calvert Cnty.*, No. GJH-15-920, 2016 WL 5335477, at *4 (D. Md. Sept. 22, 2016) (citing *Mimms*, 434 U.S. at 111).  Additionally, "[a]s a general rule, officers conducting an arrest or investigatory stop are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the arrest and/or stop." *Newman v. Green*, 198 F. Supp. 2d 664, 668 (D. Md. 2002) (citing *United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995)) (internal citations omitted).

Here, the officers used reasonable and appropriate force to remove Anderson from the vehicle and place her under control.  Before attempting to remove Anderson, the officers spoke

24

with her and informed her that if she did not willingly exit the vehicle, they would have to remove her.  They continued to speak to her throughout the altercation.  Such efforts to "temper or limit the amount of force" weigh in the officers' favor.  *Lombardo*, 141 S. Ct. at 2241.  Additionally, the officers grabbed Anderson and restrained her in response to her physical resistance, including her attempts to kick them.  Noncompliance and physical resistance, particularly when violent, justify proportionate force.  *See Graham*, 490 U.S. at 396; *Coleman*, 2016 WL 533477, at *7–8 (finding officers reasonably used force to remove a noncompliant driver from a vehicle during a traffic stop).  The officers used enough force to remove Anderson from the vehicle and control her, and no more.  They did not grab her or yank her around unnecessarily, and they held her on the ground only long enough to apply restraints to limit her ongoing physical resistance.  The recording does not show that the officers inappropriately touched Anderson, threatened her with a knife, or threw her around "as if [she] was a[n] animal."  *See* ECF 1, ¶ 33.

Anderson's subjective fear of being raped and killed based on the absence of a female police officer, whether such a fear was rational, carries no weight in the excessive force analysis, which asks whether the degree of force used was "objectively reasonable."  *Graham*, 490 U.S. at 396–97.  Additionally, while Anderson provides photos of several scrapes and bruises she suffered during the incident, her injuries were minor and do not indicate the use of excessive force.  *See Hupp v. Cook*, 931 F.3d 307, 322 (4th Cir. 2019) (noting the extent of a plaintiff's injuries, which included a contusion, lumbosacral strain, and emotional trauma, were "slight" and did not support a finding of excessive force).

The Court finds no genuine dispute of material fact as to whether the force used by the defendants was objectively reasonable in the circumstances.  *See Graham*, 490 U.S. at 397.  The

Seat Pleasant defendants' motion for summary judgment is granted on the § 1983 excessive force claim.

### 3.  Negligent Training and Supervision

Anderson claims the training and supervision of Cpl. Stevens was negligent.  She does not identify the individual or entity responsible for Cpl. Stevens' training and supervision, but the Court presumes she brings the claim against the Department.  The failure to train is one way to establish municipal liability for a constitutional violation under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  *See Johnson v. Balt. Police Dep't*, 452 F. Supp. 3d 283, 309 (D. Md. 2020).  It is not itself a constitutional violation—without an underlying constitutional violation, there is no municipal liability.  "To impose liability on a municipality based on a failure to train, a plaintiff must plead (and ultimately prove) that . . . an employee of the municipality violated the plaintiff's constitutional or statutory rights . . . ."  *Artiga Carrero v. Farrelly*, 270 F. Supp. 3d 851, 864 (D. Md. 2017) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) and *Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000)); *see Timpson ex rel. Timpson v. Anderson Cnty. Disabilities & Spec. Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (requiring a causal link between the defendant's inaction and "the particular constitutional injury suffered by the plaintiff").  Anderson has not alleged a constitutional violation by any of the individual officers.  The § 1983 failure-to-train claim is dismissed without prejudice.

### E.  State-Law Claims

Anderson's remaining claims arise under Maryland law.  A federal court's supplemental jurisdiction over state-law claims is not extinguished as a matter of course when all pending federal claims are dismissed.  *See* 28 U.S.C. § 1367; *Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995).  A court "may," however, "decline to exercise supplemental jurisdiction over a claim"  if it

"has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).  In those circumstances, whether to dismiss a claim is committed to the discretion of the trial court.  *ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 394 (4th Cir. 2012); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 353–57 (1988).  Courts consider "the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over . . . pendent state-law claims."  *See, e.g.*, *Tolliver v. Tandium Corp.*, No. ELH-21-1441, 2022 WL 80587, at *3–4 (D. Md. Jan. 7, 2022) (quoting *Carnegie-Mellon*, 484 U.S. at 350); *see also Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 617 (4th Cir. 2001) (stating courts should consider the *Carnegie-Mellon* factors although that case preceded the adoption of 28 U.S.C. § 1367(c)).

This Court routinely declines to exercise jurisdiction over state-law claims if all federal claims have been dismissed.  *See, e.g.*, *Tolliver*, 2022 WL 80587, at *4; *Conkel v. Family & Children's Servs.*, No. JKB-13-331, 2013 WL 2105854, at *1 (D. Md. May 13, 2013); *NRT Mid-Atl., LLC v. D'Ambrosia*, No. DKC-08-166, 2008 WL 11367473, at *1 (D. Md. Dec. 22, 2008). The Court sees no reason to depart from that approach here.  The remaining claims raise only questions of state law, many of which turn on an interpretation of Maryland's Declaration of Rights.  Additionally, this case is early in its life and no discovery has taken place.   The values of comity, judicial economy, and convenience support dismissal.  Accordingly, the Court declines to exercise supplemental jurisdiction over the remaining claims.

## IV.    Conclusion

Anderson's motion for summary judgment is denied.  The State's motion to dismiss is granted.  The Seat Pleasant defendants' motion to dismiss is granted with respect to Anderson's § 1983 claims against the Seat Pleasant defendants for false arrest, malicious prosecution, and negligent training and supervision and her claims against them under § 1981 and the Articles of

Confederation.  Summary judgment is entered in the Seat Pleasant defendants' favor on the § 1983 excessive force claim.  The Court declines to exercise supplemental jurisdiction over the remaining state-law claims, which are dismissed without prejudice.  McDonald Auto's motion is denied as moot.


Date:  August 25, 2023                                                   _____

Deborah L. Boardman
United States District Judge